914 F.2d 1493
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff--Appellee,
v.
Marcus Kevin RAVEN, a/k/a Reginald LeRoy Dixon, Defendant--Appellant.
 No. 89-5457.
 United States Court of Appeals, Fourth Circuit.
 Argued May 11, 1990.
Decided Sept. 24, 1990.
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Albert V. Bryan, Jr., Chief District Judge. (CR-85-67-A).
 John A. Keats, Fairfax, Va., argued for appellant; Richard J. Brownell, Fairfax, Va., on brief.
 Kenton Voges Sands, Assistant United States Attorney, Alexandria, Va., argued for appellee; Henry E. Hudson, United States Attorney, Reginald K. Tom, Special Assistant United States Attorney, Alexandria, Va., on brief.
 E.D.Va.
 AFFIRMED.
 Before MURNAGHAN, Circuit Judge, YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation, and McMILLAN, Senior United States District Judge for the Western District of North Carolina, sitting by designation.
 PER CURIAM:
 
 
 1
 The appellant, Marcus Kevin Raven, has appealed the denial of his motion to suppress evidence of cocaine found in his bag during a search at Washington, D.C., National Airport. We hold that Raven gave voluntary consent to the search and affirm the denial of the motion.
 
 I.
 
 2
 The incident giving rise to the charge against Raven occurred on February 28, 1985, at Washington National Airport. On that date, at approximately 10:30 p.m., Officer Charles Bean of the Federal Aviation Administration ("F.A.A.") was on routine patrol at the airport. Bean testified that he noticed that Raven and another individual, both located on a taxicab platform, appeared to be fighting with one another. As Officer Bean continued to monitor the men, he determined that they were just play-fighting.
 
 
 3
 A few minutes later, Bean observed a woman, who was pushing a wheelchair occupied by a man, pass Raven and his companion. Bean observed Raven step in closely behind the woman, follow her for a few steps and place his left hand into her purse, which was open and hung over her right shoulder. Simultaneously, Bean also saw that the woman jerked her purse back, which had the effect of dislodging Raven's hand.
 
 
 4
 Bean then observed Raven enter a taxicab that was waiting at the platform. Bean had a continuous view of Raven's left hand from the time of the contact between Raven and the woman's purse and the time at which Raven opened the taxi door. At no time did Bean observe Raven put his hand in his pocket.
 
 
 5
 Bean immediately approached Raven, identified himself as a police officer, told him to exit the taxicab, and asked for identification, whereupon Raven produced a Florida driver's license and an airline ticket stub that showed he had arrived that evening on a flight from Miami. At that same time, Bean dispatched another F.A.A. officer to find the woman with the wheelchair. That officer reported back to Bean that he found the woman, discussed the matter with her, and allowed her to search her purse to see if anything was missing. Nothing was missing and the officer released the woman without identifying her.
 
 
 6
 Bean then took Raven into custody and escorted him to the Washington National Airport police station, where Raven was placed in a witness room. Bean testified that at that point Raven was in custody and not free to go. In the witness room Bean did not question Raven, but ran a computer check of Raven's criminal history and conferred with a superior, Detective Luconi. Bean determined that he did not have enough evidence to charge Raven with anything.
 
 
 7
 The detention lasted approximately twenty minutes and during that time no one informed Raven of any constitutional rights. In answer to Raven's question about his status, Bean told him that he would not be charged and that he was free to leave. Raven got up and started to leave the witness room. At that same time, Detective Joseph Grimes, a police officer on special assignment with the Drug Enforcement Administration, entered the room.
 
 
 8
 Detective Grimes, after identifying himself, asked Raven if he had just arrived on a flight from Miami, to which Raven answered yes. Detective Grimes then asked Raven if he would mind a search of his baggage, which consisted of a black nylon shoulder bag that Raven had brought with him to the police station. The parties dispute the sequence of events that followed. The government contends that Raven consented and was given a consent form that informed him, inter alia, of his right to refuse consent to the search. According to the government, Raven read and signed the consent form. In contrast, Raven testified that after he was brought to the airport police station, Bean never communicated to him that he was free to leave. Raven also testified that Detective Grimes searched his shoulder bag without receiving any prior consent. Raven testified that he signed the consent search form only after the search of his shoulder bag had already been conducted by Grimes.
 
 
 9
 As a result of the search, Grimes found two plastic bags containing approximately 140 grams of cocaine inside the pocket of a raincoat packed inside the shoulder bag. At that time, Grimes arrested Raven and advised him of his Miranda rights.
 
 
 10
 Raven filed a motion to suppress the cocaine on the grounds that it was obtained during an illegal search violating his fourth amendment rights. He contended that Officer Bean did not have probable cause to place him in custody and take him to the police station. His later consent, he argued, was tainted by the illegal arrest.
 
 
 11
 At the conclusion of the suppression hearing, the district court denied the motion to suppress. The district judge found Bean had probable cause to arrest Raven for attempted larceny. The judge also credited Bean's testimony that Raven was told he was free to leave and that Raven signed the consent form before the search.
 
 
 12
 On May 31, 1985, Raven entered before the district court a plea of guilty to the charge in the indictment pursuant to Fed.R.Crim.P. 11(a)(2), reserving his right to appeal the denial of his motion to suppress evidence.
 
 
 13
 Thereafter, Raven failed to appear at his scheduled sentencing date of June 21, 1985, and subsequently remained in fugitive status for approximately four years. Upon his apprehension and appearance for sentencing on September 1, 1989, the district court sentenced Raven to three years of incarceration to be followed by three years of supervised parole. Raven has appealed the denial of his motion to suppress.
 
 II.
 A. Probable Cause
 
 14
 No one disputes that the investigatory stop of Raven at the taxi stand was permissible. Terry v. Ohio, 392 U.S. 1 (1986). It is Officer Bean's actions after he had satisfied himself that nothing was stolen from the woman's purse, that indeed no one had even bothered to get the woman's name, that are questioned. At the point when Bean escorted Raven to the small police substation for further questioning, acknowledging that Raven was not free to go, the stop turned into a warrantless arrest. Dunaway v. New York, 442 U.S. 200 (1979) (police confinement which goes beyond the limited restraint of a Terry investigatory stop may be constitutionally justified only by probable cause). It was thus at that point that Bean needed probable cause to detain Raven further.
 
 
 15
 The government does not dispute that probable cause was necessary. Rather it insists, as the district court found, that Officer Bean had witnessed an attempted larceny and that event justified a full-scale arrest. The district court was not disturbed by the difficulty the government might have in proving such a crime, absent the alleged victim's testimony:
 
 
 16
 The fact that the victim said she wasn't missing anything doesn't mean that there is no offense occurred [sic].... And I think that the fact that the victim had been released might mean that it would be difficult to prove, although I think the officer's testimony alone would probably establish a prima facie case of an attempted shoplifting or attempted purse snatching, or attempted petit larceny from the person.... So I think there was probable cause to arrest.
 
 
 17
 We agree. Probable cause for an arrest exists "when at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." United States v. Manbeck, 744 F.2d 360, 376 (4th Cir.1984) (citing Beck v. Ohio, 378 U.S. 89, 91 (1964)), cert. denied, 469 U.S. 1217 (1985). Officer Bean's testimony presents a case for attempted larceny. No other reason exists for Raven to have stepped behind the woman and reached into her purse. While Bean had ascertained that nothing was actually stolen, that information did not mean that Raven was innocent. It means that the police could only consider charging Raven with attempted, as opposed to actual, larceny.
 
 B. Voluntary Consent
 
 18
 Raven alleges that if the arrest was illegal then the consent given for a search during such an illegal detainment is also invalid. See Florida v. Royer, 460 U.S. 491 (1983). As we have found the arrest to be supported by probable cause, the ensuing consent is not so tainted.
 
 
 19
 The arrest here was terminated when Bean told Raven that he could leave. As Raven got up and started to leave the room, he met Detective Grimes at the door. Grimes asked Raven if he had just arrived from Miami. Upon hearing that he had, Grimes requested permission to search Raven's luggage. Raven gave the consent. Though Raven's testimony conflicted in significant respects with that of Bean and Grimes, the district judge believed the officers' version of events.
 
 
 20
 The question then becomes whether the consent was voluntary. Whether a suspect's consent is voluntary is essentially a factual determination. Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Such a determination will be upheld on appeal unless clearly erroneous. United States v. Sutton, 850 F.2d 1083, 1086 (5th Cir.1988). Courts look at the totality of the circumstances surrounding the consent to see if it was given freely and voluntarily. See United States v. Mendenhall, 466 U.S. 544, 557-59 (1980) (plurality opinion). The district court's findings of fact are not clearly erroneous. The denial of Raven's motion to suppress is
 
 
 21
 AFFIRMED.